(Slip Opinion) OCTOBER TERM, 2012 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## AGENCY FOR INTERNATIONAL DEVELOPMENT ET AL. *v.* ALLIANCE FOR OPEN SOCIETY INTERNATIONAL, INC., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 12–10.   Argued April 22, 2013—Decided June 20, 2013

In the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 (Leadership Act), 22 U. S. C. §7601 *et seq.*, Congress has authorized the appropriation of billions of dollars to fund efforts by nongovernmental organizations to combat HIV/AIDS worldwide.   The Act imposes two related conditions: (1) No funds "may be used to promote or advocate the legalization or practice of prostitution," §7631(e); and (2) no funds may be used by an organization "that does not have a policy explicitly opposing prostitution," §7631(f).   To enforce the second condition, known as the Policy Requirement, the Department of Health and Human Services (HHS) and the United States Agency for International Development (USAID) require funding recipients to agree in their award documents that they oppose prostitution.

Respondents, recipients of Leadership Act funds who wish to remain neutral on prostitution, sought a declaratory judgment that the Policy Requirement violates their First Amendment rights.   The District Court issued a preliminary injunction, barring the Government from cutting off respondents' Leadership Act funding during the litigation or from otherwise taking action based on their privately funded speech.   The Second Circuit affirmed, concluding that the Policy Requirement, as implemented by the agencies, violated respondents' freedom of speech.

*Held*: The Policy Requirement violates the First Amendment by compelling as a condition of federal funding the affirmation of a belief that by its nature cannot be confined within the scope of the Gov-

ernment program.  Pp. 6–15.

  (a) The Policy Requirement mandates that recipients of federal funds explicitly agree with the Government's policy to oppose prostitution.  The First Amendment, however, "prohibits the government from telling people what they must say."  *Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.*, 547 U. S. 47, 61.  As a direct regulation, the Policy Requirement would plainly violate the First Amendment.  The question is whether the Government may nonetheless impose that requirement as a condition of federal funding.  Pp. 6–7.

  (b) The Spending Clause grants Congress broad discretion to fund private programs or activities for the "general Welfare," Art. I, §8, cl. 1, including authority to impose limits on the use of such funds to ensure they are used in the manner Congress intends.  *Rust* v. *Sullivan*, 500 U. S. 173, 195, n. 4.  As a general matter, if a party objects to those limits, its recourse is to decline the funds.  In some cases, however, a funding condition can result in an unconstitutional burden on First Amendment rights.  The distinction that has emerged from this Court's cases is between conditions that define the limits of the Government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the federal program itself.

  *Rust* illustrates the distinction.  In that case, the Court considered Title X of the Public Health Service Act, which authorized grants to health-care organizations offering family planning services, but prohibited federal funds from being "used in programs where abortion is a method of family planning."  500 U. S., at 178.  To enforce the provision, HHS regulations barred Title X projects from advocating abortion and required grantees to keep their Title X projects separate from their other projects.  The regulations were valid, the Court explained, because they governed only the scope of the grantee's Title X projects, leaving the grantee free to engage in abortion advocacy through programs that were independent from its Title X projects.  Because the regulations did not prohibit speech "outside the scope of the federally funded program," they did not run afoul of the First Amendment.  *Id.,* at 197.  Pp. 7–11.

  (c) The distinction between conditions that define a federal program and those that reach outside it is not always self-evident, but the Court is confident that the Policy Requirement falls on the unconstitutional side of the line.  To begin, the Leadership Act's other funding condition, which prohibits Leadership Act funds from being used "to promote or advocate the legalization or practice of prostitution or sex trafficking," §7631(e), ensures that federal funds will not

Syllabus

be used for prohibited purposes. The Policy Requirement thus must be doing something more—and it is. By demanding that funding recipients adopt and espouse, as their own, the Government's view on an issue of public concern, the Policy Requirement by its very nature affects "protected conduct outside the scope of the federally funded program." *Rust, supra,* at 197. A recipient cannot avow the belief dictated by the condition when spending Leadership Act funds, and assert a contrary belief when participating in activities on its own time and dime.

The Government suggests that if funding recipients could promote or condone prostitution using private funds, "it would undermine the government's program and confuse its message opposing prostitution." Brief for Petitioners 37. But the Policy Requirement goes beyond preventing recipients from using private funds in a way that would undermine the federal program. It requires them to pledge allegiance to the Government's policy of eradicating prostitution. That condition on funding violates the First Amendment. Pp. 11–15.

651 F. 3d 218, affirmed.

ROBERTS, C. J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, BREYER, ALITO, and SOTOMAYOR, JJ., joined. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined. KAGAN, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–10

_____

## AGENCY FOR INTERNATIONAL DEVELOPMENT, ET AL., PETITIONERS *v.* ALLIANCE FOR OPEN SOCIETY INTERNATIONAL, INC., ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 20, 2013]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

The United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 (Leadership Act), 117 Stat. 711, as amended, 22 U. S. C. §7601 *et seq.*, outlined a comprehensive strategy to combat the spread of HIV/AIDS around the world. As part of that strategy, Congress authorized the appropriation of billions of dollars to fund efforts by nongovernmental organizations to assist in the fight. The Act imposes two related conditions on that funding: First, no funds made available by the Act "may be used to promote or advocate the legalization or practice of prostitution or sex trafficking." §7631(e). And second, no funds may be used by an organization "that does not have a policy explicitly opposing prostitution and sex trafficking." §7631(f). This case concerns the second of these conditions, referred to as the Policy Requirement. The question is whether that funding condition violates a recipient's First Amendment rights.

2     AGENCY FOR INT'L DEVELOPMENT *v.* ALLIANCE FOR
OPEN SOCIETY INT'L, INC.

Opinion of the Court

I

Congress passed the Leadership Act in 2003 after finding that HIV/AIDS had "assumed pandemic proportions, spreading from the most severely affected regions, sub-Saharan Africa and the Caribbean, to all corners of the world, and leaving an unprecedented path of death and devastation." 22 U. S. C. §7601(1). According to congressional findings, more than 65 million people had been infected by HIV and more than 25 million had lost their lives, making HIV/AIDS the fourth highest cause of death worldwide. In sub-Saharan Africa alone, AIDS had claimed the lives of more than 19 million individuals and was projected to kill a full quarter of the population of that area over the next decade. The disease not only directly endangered those infected, but also increased the potential for social and political instability and economic devastation, posing a security issue for the entire international community. §§7601(2)–(10).

In the Leadership Act, Congress directed the President to establish a "comprehensive, integrated" strategy to combat HIV/AIDS around the world. §7611(a). The Act sets out 29 different objectives the President's strategy should seek to fulfill, reflecting a multitude of approaches to the problem. The strategy must include, among other things, plans to increase the availability of treatment for infected individuals, prevent new infections, support the care of those affected by the disease, promote training for physicians and other health care workers, and accelerate research on HIV/AIDS prevention methods, all while providing a framework for cooperation with international organizations and partner countries to further the goals of the program. §§7611(a)(1)–(29).

The Act "make[s] the reduction of HIV/AIDS behavioral risks a priority of all prevention efforts." §7611(a)(12); see also §7601(15) ("Successful strategies to stem the spread of the HIV/AIDS pandemic will require . . . measures to

address the social and behavioral causes of the problem"). The Act's approach to reducing behavioral risks is multi-faceted. The President's strategy for addressing such risks must, for example, promote abstinence, encourage monogamy, increase the availability of condoms, promote voluntary counseling and treatment for drug users, and, as relevant here, "educat[e] men and boys about the risks of procuring sex commercially" as well as "promote alternative livelihoods, safety, and social reintegration strategies for commercial sex workers." §7611(a)(12). Congress found that the "sex industry, the trafficking of individuals into such industry, and sexual violence" were factors in the spread of the HIV/AIDS epidemic, and determined that "it should be the policy of the United States to eradicate" prostitution and "other sexual victimization." §7601(23).

The United States has enlisted the assistance of non-governmental organizations to help achieve the many goals of the program. Such organizations "with experience in health care and HIV/AIDS counseling," Congress found, "have proven effective in combating the HIV/AIDS pandemic and can be a resource in . . . provid[ing] treatment and care for individuals infected with HIV/AIDS." §7601(18). Since 2003, Congress has authorized the appropriation of billions of dollars for funding these organizations' fight against HIV/AIDS around the world. §2151b–2(c); §7671.

Those funds, however, come with two conditions: First, no funds made available to carry out the Leadership Act "may be used to promote or advocate the legalization or practice of prostitution or sex trafficking." §7631(e). Second, no funds made available may "provide assistance to any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking, except . . . to the Global Fund to Fight AIDS, Tuberculosis and Malaria, the World Health Organization, the International

4      AGENCY FOR INT'L DEVELOPMENT *v.* ALLIANCE FOR
OPEN SOCIETY INT'L, INC.

Opinion of the Court

AIDS Vaccine Initiative or to any United Nations agency."
§7631(f). It is this second condition—the Policy Require-
ment—that is at issue here.

The Department of Health and Human Services (HHS)
and the United States Agency for International Develop-
ment (USAID) are the federal agencies primarily respon-
sible for overseeing implementation of the Leadership Act.
To enforce the Policy Requirement, the agencies have
directed that the recipient of any funding under the Act
agree in the award document that it is opposed to "prosti-
tution and sex trafficking because of the psychological and
physical risks they pose for women, men, and children."
45 CFR §89.1(b) (2012); USAID, Acquisition & Assistance
Policy Directive 12–04, p. 6 (AAPD 12–04).

## II

Respondents are a group of domestic organizations
engaged in combating HIV/AIDS overseas. In addition to
substantial private funding, they receive billions annually
in financial assistance from the United States, including
under the Leadership Act. Their work includes programs
aimed at limiting injection drug use in Uzbekistan, Tajiki-
stan, and Kyrgyzstan, preventing mother-to-child HIV
transmission in Kenya, and promoting safer sex practices
in India. Respondents fear that adopting a policy explicitly
opposing prostitution may alienate certain host govern-
ments, and may diminish the effectiveness of some of
their programs by making it more difficult to work with
prostitutes in the fight against HIV/AIDS. They are also
concerned that the Policy Requirement may require them
to censor their privately funded discussions in publica-
tions, at conferences, and in other forums about how best
to prevent the spread of HIV/AIDS among prostitutes.

In 2005, respondents Alliance for Open Society Interna-
tional and Pathfinder International commenced this litiga-
tion, seeking a declaratory judgment that the Government's

implementation of the Policy Requirement violated their First Amendment rights. Respondents sought a preliminary injunction barring the Government from cutting off their funding under the Act for the duration of the litigation, from unilaterally terminating their cooperative agreements with the United States, or from otherwise taking action solely on the basis of respondents' own privately funded speech. The District Court granted such a preliminary injunction, and the Government appealed.

While the appeal was pending, HHS and USAID issued guidelines on how recipients of Leadership Act funds could retain funding while working with affiliated organizations not bound by the Policy Requirement. The guidelines permit funding recipients to work with affiliated organizations that "engage[] in activities inconsistent with the recipient's opposition to the practices of prostitution and sex trafficking" as long as the recipients retain "objective integrity and independence from any affiliated organization." 45 CFR §89.3; see also AAPD 12–04, at 6–7. Whether sufficient separation exists is determined by the totality of the circumstances, including "but not . . . limited to" (1) whether the organizations are legally separate; (2) whether they have separate personnel; (3) whether they keep separate accounting records; (4) the degree of separation in the organizations' facilities; and (5) the extent to which signs and other forms of identification distinguish the organizations. 45 CFR §§89.3(b)(1)–(5); see also AAPD 12–04, at 6–7.

The Court of Appeals summarily remanded the case to the District Court to consider whether the preliminary injunction was still appropriate in light of the new guidelines. On remand, the District Court issued a new preliminary injunction along the same lines as the first, and the Government renewed its appeal.

The Court of Appeals affirmed, concluding that respondents had demonstrated a likelihood of success on the

merits of their First Amendment challenge under this Court's "unconstitutional conditions" doctrine. 651 F. 3d 218 (CA2 2011). Under this doctrine, the court reasoned, "the government may not place a condition on the receipt of a benefit or subsidy that infringes upon the recipient's constitutionally protected rights, even if the government has no obligation to offer the benefit in the first instance." *Id.,* at 231 (citing *Perry* v. *Sindermann*, 408 U. S. 593, 597 (1972)). And a condition that compels recipients "to espouse the government's position" on a subject of international debate could not be squared with the First Amendment. 651 F. 3d, at 234. The court concluded that "the Policy Requirement, as implemented by the Agencies, falls well beyond what the Supreme Court . . . ha[s] upheld as permissible funding conditions." *Ibid.*

Judge Straub dissented, expressing his view that the Policy Requirement was an "entirely rational exercise of Congress's powers pursuant to the Spending Clause." *Id.,* at 240.

We granted certiorari. 568 U. S. ___ (2013).

### III

The Policy Requirement mandates that recipients of Leadership Act funds explicitly agree with the Government's policy to oppose prostitution and sex trafficking. It is, however, a basic First Amendment principle that "freedom of speech prohibits the government from telling people what they must say." *Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.*, 547 U. S. 47, 61 (2006) (citing *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 642 (1943), and *Wooley* v. *Maynard*, 430 U. S. 705, 717 (1977)). "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 641 (1994); see *Knox* v.

*Service Employees*, 567 U. S. \_\_\_, \_\_\_–\_\_\_ (2012) (slip op., at 8–9) ("The government may not . . . compel the endorsement of ideas that it approves."). Were it enacted as a direct regulation of speech, the Policy Requirement would plainly violate the First Amendment. The question is whether the Government may nonetheless impose that requirement as a condition on the receipt of federal funds.

## A

The Spending Clause of the Federal Constitution grants Congress the power "[t]o lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." Art. I, §8, cl. 1. The Clause provides Congress broad discretion to tax and spend for the "general Welfare," including by funding particular state or private programs or activities. That power includes the authority to impose limits on the use of such funds to ensure they are used in the manner Congress intends. *Rust* v. *Sullivan*, 500 U. S. 173, 195, n. 4 (1991) ("Congress' power to allocate funds for public purposes includes an ancillary power to ensure that those funds are properly applied to the prescribed use.").

As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights. See, *e.g., United States* v. *American Library Assn., Inc.*, 539 U. S. 194, 212 (2003) (plurality opinion) (rejecting a claim by public libraries that conditioning funds for Internet access on the libraries' installing filtering software violated their First Amendment rights, explaining that "[t]o the extent that libraries wish to offer unfiltered access, they are free to do so without federal assistance"); *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540, 546 (1983) (dismissing "the

notion that First Amendment rights are somehow not fully
realized unless they are subsidized by the State" (internal
quotation marks omitted)).

At the same time, however, we have held that the Gov-
ernment "'may not deny a benefit to a person on a basis
that infringes his constitutionally protected . . . freedom of
speech even if he has no entitlement to that benefit.'"
*Forum for Academic and Institutional Rights*, *supra*, at 59
(quoting *American Library Assn., supra,* at 210). In some
cases, a funding condition can result in an unconstitution-
al burden on First Amendment rights. See *Forum for
Academic and Institutional Rights*, *supra*, at 59 (the First
Amendment supplies "a limit on Congress' ability to place
conditions on the receipt of funds").

The dissent thinks that can only be true when the condi-
tion is not relevant to the objectives of the program (al-
though it has its doubts about that), or when the condition
is actually coercive, in the sense of an offer that cannot be
refused. See *post*, at 2–3 (opinion of SCALIA, J.). Our
precedents, however, are not so limited. In the present
context, the relevant distinction that has emerged from
our cases is between conditions that define the limits of
the government spending program—those that specify the
activities Congress wants to subsidize—and conditions
that seek to leverage funding to regulate speech outside
the contours of the program itself. The line is hardly
clear, in part because the definition of a particular pro-
gram can always be manipulated to subsume the chal-
lenged condition. We have held, however, that "Congress
cannot recast a condition on funding as a mere definition
of its program in every case, lest the First Amendment be
reduced to a simple semantic exercise." *Legal Services
Corporation* v. *Velazquez*, 531 U. S. 533, 547 (2001).

A comparison of two cases helps illustrate the distinc-
tion: In *Regan* v. *Taxation With Representation of Wash-
ington*, the Court upheld a requirement that nonprofit

organizations seeking tax-exempt status under 26 U. S. C. §501(c)(3) not engage in substantial efforts to influence legislation. The tax-exempt status, we explained, "ha[d] much the same effect as a cash grant to the organization." 461 U. S., at 544. And by limiting §501(c)(3) status to organizations that did not attempt to influence legislation, Congress had merely "chose[n] not to subsidize lobbying." *Ibid.* In rejecting the nonprofit's First Amendment claim, the Court highlighted—in the text of its opinion, but see *post*, at 5—the fact that the condition did not prohibit that organization from lobbying Congress altogether. By returning to a "dual structure" it had used in the past—separately incorporating as a §501(c)(3) organization and §501(c)(4) organization—the nonprofit could continue to claim §501(c)(3) status for its nonlobbying activities, while attempting to influence legislation in its §501(c)(4) capacity with separate funds. *Ibid.* Maintaining such a structure, the Court noted, was not "unduly burdensome." *Id.,* at 545, n. 6. The condition thus did not deny the organization a government benefit "on account of its intention to lobby." *Id.*, at 545.

In *FCC* v. *League of Women Voters of California*, by contrast, the Court struck down a condition on federal financial assistance to noncommercial broadcast television and radio stations that prohibited all editorializing, including with private funds. 468 U. S. 364, 399–401 (1984). Even a station receiving only one percent of its overall budget from the Federal Government, the Court explained, was "barred absolutely from all editorializing." *Id.*, at 400. Unlike the situation in *Regan*, the law provided no way for a station to limit its use of federal funds to noneditorializing activities, while using private funds "to make known its views on matters of public importance." 468 U. S., at 400. The prohibition thus went beyond ensuring that federal funds not be used to subsidize "public broadcasting station editorials," and instead leveraged the

federal funding to regulate the stations' speech outside the
scope of the program. *Id.,* at 399 (internal quotation
marks omitted).

Our decision in *Rust* v. *Sullivan* elaborated on the ap-
proach reflected in *Regan* and *League of Women Voters.* In
*Rust*, we considered Title X of the Public Health Service
Act, a Spending Clause program that issued grants to
nonprofit health-care organizations "to assist in the estab-
lishment and operation of voluntary family planning
projects [to] offer a broad range of acceptable and effective
family planning methods and services." 500 U. S., at 178
(internal quotation marks omitted). The organizations
received funds from a variety of sources other than the
Federal Government for a variety of purposes. The Act,
however, prohibited the Title X federal funds from being
"used in programs where abortion is a method of family
planning." *Ibid.* (internal quotation marks omitted). To
enforce this provision, HHS regulations barred Title X
projects from advocating abortion as a method of family
planning, and required grantees to ensure that their Title
X projects were "'physically and financially separate'"
from their other projects that engaged in the prohibited
activities. *Id.*, at 180–181 (quoting 42 CFR §59.9 (1989)).
A group of Title X funding recipients brought suit, claim-
ing the regulations imposed an unconstitutional condition
on their First Amendment rights. We rejected their claim.

We explained that Congress can, without offending the
Constitution, selectively fund certain programs to address
an issue of public concern, without funding alterna-
tive ways of addressing the same problem. In Title X,
Congress had defined the federal program to encourage
only particular family planning methods. The challenged
regulations were simply "designed to ensure that the
limits of the federal program are observed," and "that
public funds [are] spent for the purposes for which they
were authorized." *Rust*, 500 U. S., at 193, 196.

In making this determination, the Court stressed that "Title X expressly distinguishes between a Title X *grantee* and a Title X *project*." *Id.,* at 196. The regulations governed only the scope of the grantee's Title X projects, leaving it "unfettered in its other activities*." Ibid.* "The Title X *grantee* can continue to . . . engage in abortion advocacy; it simply is required to conduct those activities through programs that are separate and independent from the project that receives Title X funds." *Ibid.* Because the regulations did not "prohibit[] the recipient from engaging in the protected conduct outside the scope of the federally funded program," they did not run afoul of the First Amendment. *Id.*, at 197.

B

As noted, the distinction drawn in these cases—between conditions that define the federal program and those that reach outside it—is not always self-evident. As Justice Cardozo put it in a related context, "Definition more precise must abide the wisdom of the future." *Steward Machine Co.* v. *Davis*, 301 U. S. 548, 591 (1937). Here, however, we are confident that the Policy Requirement falls on the unconstitutional side of the line.

To begin, it is important to recall that the Leadership Act has two conditions relevant here. The first— unchallenged in this litigation—prohibits Leadership Act funds from being used "to promote or advocate the legalization or practice of prostitution or sex trafficking." 22 U. S. C. §7631(e). The Government concedes that §7631(e) by itself ensures that federal funds will not be used for the prohibited purposes. Brief for Petitioners 26–27.

The Policy Requirement therefore must be doing something more—and it is. The dissent views the Requirement as simply a selection criterion by which the Government identifies organizations "who believe in its ideas to carry them to fruition." *Post*, at 1. As an initial matter, what-

ever purpose the Policy Requirement serves in selecting funding recipients, its effects go beyond selection. The Policy Requirement is an ongoing condition on recipients' speech and activities, a ground for terminating a grant after selection is complete. See AAPD 12–04, at 12. In any event, as the Government acknowledges, it is not simply seeking organizations that oppose prostitution. Reply Brief 5. Rather, it explains, "Congress has expressed its purpose 'to eradicate' prostitution and sex trafficking, 22 U. S. C. §7601(23), and it wants recipients *to adopt* a similar stance." Brief for Petitioners 32 (emphasis added). This case is not about the Government's ability to enlist the assistance of those with whom it already agrees. It is about compelling a grant recipient to adopt a particular belief as a condition of funding.

By demanding that funding recipients adopt—as their own—the Government's view on an issue of public concern, the condition by its very nature affects "protected conduct outside the scope of the federally funded program." *Rust*, 500 U. S.*,* at 197. A recipient cannot avow the belief dictated by the Policy Requirement when spending Leadership Act funds, and then turn around and assert a contrary belief, or claim neutrality, when participating in activities on its own time and dime. By requiring recipients to profess a specific belief, the Policy Requirement goes beyond defining the limits of the federally funded program to defining the recipient. See *ibid.* ("our 'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program").

The Government contends that the affiliate guidelines, established while this litigation was pending, save the program. Under those guidelines, funding recipients are

permitted to work with affiliated organizations that do not abide by the condition, as long as the recipients retain "objective integrity and independence" from the unfettered affiliates. 45 CFR §89.3. The Government suggests the guidelines alleviate any unconstitutional burden on the respondents' First Amendment rights by allowing them to either: (1) accept Leadership Act funding and comply with Policy Requirement, but establish affiliates to communicate contrary views on prostitution; or (2) decline funding themselves (thus remaining free to express their own views or remain neutral), while creating affiliates whose sole purpose is to receive and administer Leadership Act funds, thereby "cabin[ing] the effects" of the Policy Requirement within the scope of the federal program. Brief for Petitioners 38–39, 44–49.

Neither approach is sufficient. When we have noted the importance of affiliates in this context, it has been because they allow an organization bound by a funding condition to exercise its First Amendment rights outside the scope of the federal program. See *Rust*, *supra*, at 197–198. Affiliates cannot serve that purpose when the condition is that a funding recipient espouse a specific belief as its own. If the affiliate is distinct from the recipient, the arrangement does not afford a means for the *recipient* to express *its* beliefs. If the affiliate is more clearly identified with the recipient, the recipient can express those beliefs only at the price of evident hypocrisy. The guidelines themselves make that clear. See 45 CFR §89.3 (allowing funding recipients to work with affiliates whose conduct is "inconsistent with *the recipient's opposition* to the practices of prostitution and sex trafficking" (emphasis added)).

The Government suggests that the Policy Requirement is necessary because, without it, the grant of federal funds could free a recipient's private funds "to be used to promote prostitution or sex trafficking." Brief for Petitioners 27 (citing *Holder* v. *Humanitarian Law Project*, 561 U. S.

1, \_\_\_–\_\_\_ (2010) (slip op., at 25–26)). That argument assumes that federal funding will simply supplant private funding, rather than pay for new programs or expand existing ones. The Government offers no support for that assumption as a general matter, or any reason to believe it is true here. And if the Government's argument were correct, *League of Women Voters* would have come out differently, and much of the reasoning of *Regan* and *Rust* would have been beside the point.

The Government cites but one case to support that argument, *Holder* v. *Humanitarian Law Project*. That case concerned the quite different context of a ban on providing material support to terrorist organizations, where the record indicated that support for those organizations' nonviolent operations was funneled to support their violent activities. 561 U. S., at \_\_\_ (slip op., at 26).

Pressing its argument further, the Government contends that "if organizations awarded federal funds to implement Leadership Act programs could at the same time promote or affirmatively condone prostitution or sex trafficking, whether using public *or private* funds, it would undermine the government's program and confuse its message opposing prostitution and sex trafficking." Brief for Petitioners 37 (emphasis added). But the Policy Requirement goes beyond preventing recipients from using private funds in a way that would undermine the federal program. It requires them to pledge allegiance to the Government's policy of eradicating prostitution. As to that, we cannot improve upon what Justice Jackson wrote for the Court 70 years ago: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U. S., at 642.

Opinion of the Court

\*     \*     \*

The Policy Requirement compels as a condition of federal funding the affirmation of a belief that by its nature cannot be confined within the scope of the Government program. In so doing, it violates the First Amendment and cannot be sustained. The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

KAGAN, J., took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

No. 12–10

AGENCY FOR INTERNATIONAL DEVELOPMENT, ET AL., PETITIONERS *v.* ALLIANCE FOR OPEN SOCIETY INTERNATIONAL, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 20, 2013]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.

The Leadership Act provides that "any group or organization that does not have a policy explicitly opposing prostitution and sex trafficking" may not receive funds appropriated under the Act. 22 U. S. C. §7631(f). This Policy Requirement is nothing more than a means of selecting suitable agents to implement the Government's chosen strategy to eradicate HIV/AIDS. That is perfectly permissible under the Constitution.

The First Amendment does not mandate a viewpoint-neutral government. Government must choose between rival ideas and adopt some as its own: competition over cartels, solar energy over coal, weapon development over disarmament, and so forth. Moreover, the government may enlist the assistance of those who believe in its ideas to carry them to fruition; and it need not enlist for that purpose those who oppose or do not support the ideas. That seems to me a matter of the most common common sense. For example: One of the purposes of America's foreign-aid programs is the fostering of good will towards this country. If the organization Hamas—reputed to have an efficient system for delivering welfare—were excluded from a program for the distribution of U. S. food assis-

2     AGENCY FOR INT'L DEVELOPMENT *v.* ALLIANCE FOR
OPEN SOCIETY INT'L, INC.

SCALIA, J., dissenting

tance, no one could reasonably object. And that would remain true if Hamas were an organization of United States citizens entitled to the protection of the Constitution. So long as the unfunded organization remains free to engage in its activities (including anti-American propaganda) "without federal assistance," *United States* v. *American Library Assn., Inc.,* 539 U. S. 194, 212 (2003) (plurality), refusing to make use of its assistance for an enterprise to which it is opposed does not abridge its speech. And the same is true when the rejected organization is not affirmatively opposed to, but merely unsupportive of, the object of the federal program, which appears to be the case here. (Respondents do not promote prostitution, but neither do they wish to oppose it.) A federal program to encourage healthy eating habits need not be administered by the American Gourmet Society, which has nothing against healthy food but does not insist upon it.

The argument is that this commonsense principle will enable the government to discriminate against, and injure, points of view to which it is opposed. Of course the Constitution does not prohibit government spending that discriminates against, and injures, points of view to which the government is opposed; every government program which takes a position on a controversial issue does that. Anti-smoking programs injure cigar aficionados, programs encouraging sexual abstinence injure free-love advocates, etc. The constitutional prohibition at issue here is not a prohibition against discriminating against or injuring opposing points of view, but the First Amendment's prohibition against the coercing of speech. I am frankly dubious that a condition for eligibility to participate in a minor federal program such as this one runs afoul of that prohibition even when the condition is irrelevant to the goals of the program. Not every disadvantage is a coercion.

But that is not the issue before us here. Here the views

that the Government demands an applicant forswear—or that the Government insists an applicant favor—are relevant to the program in question. The program is valid only if the Government is entitled to disfavor the opposing view (here, advocacy of or toleration of prostitution). And if the program can disfavor it, so can the selection of those who are to administer the program. There is no risk that this principle will enable the Government to discriminate arbitrarily against positions it disfavors. It would not, for example, permit the Government to exclude from bidding on defense contracts anyone who refuses to abjure prostitution. But here a central part of the Government's HIV/AIDS strategy is the suppression of prostitution, by which HIV is transmitted. It is entirely reasonable to admit to participation in the program only those who believe in that goal.

According to the Court, however, this transgresses a constitutional line between conditions that operate *inside* a spending program and those that control speech *outside* of it. I am at a loss to explain what this central pillar of the Court's opinion—this distinction that the Court itself admits is "hardly clear" and "not always self-evident," *ante*, at 8, 11—has to do with the First Amendment. The distinction was alluded to, to be sure, in *Rust* v. *Sullivan*, 500 U. S. 173 (1991), but not as (what the Court now makes it) an invariable requirement for First Amendment validity. That the pro-abortion speech prohibition was limited to "inside the program" speech was relevant in *Rust* because the program itself was not an anti-abortion program. The Government remained neutral on that controversial issue, but did not wish abortion to be promoted within its family-planning-services program. The statutory objective could not be impaired, in other words, by "outside the program" pro-abortion speech. The purpose of the limitation was to prevent Government funding from providing the *means* of pro-abortion propaganda, which

the Government did not wish (and had no constitutional obligation) to provide. The situation here is vastly different. Elimination of prostitution *is* an objective of the HIV/AIDS program, and *any* promotion of prostitution— whether made inside or outside the program—*does* harm the program.

Of course the most obvious manner in which the admission to a program of an ideological opponent can frustrate the purpose of the program is by freeing up the opponent's funds for use in its ideological opposition. To use the Hamas example again: Subsidizing that organization's provision of social services enables the money that it would otherwise use for that purpose to be used, instead, for anti-American propaganda. Perhaps that problem does not exist in this case since the respondents do not affirmatively promote prostitution. But the Court's analysis categorically rejects that justification for ideological requirements in *all* cases, demanding "record indica[tion]" that "federal funding will simply supplant private funding, rather than pay for new programs." *Ante,* at 14. This seems to me quite naive. Money is fungible. The economic reality is that when NGOs can conduct their AIDS work on the Government's dime, they can expend greater resources on policies that undercut the Leadership Act. The Government need not establish by record evidence that this will happen. To make it a valid consideration in determining participation in federal programs, it suffices that this is a real and obvious risk.

None of the cases the Court cites for its holding provide support. I have already discussed *Rust.* As for *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540 (1983), that case *upheld* rather than invalidated a prohibition against lobbying as a condition of receiving 26 U. S. C. §501(c)(3) tax-exempt status. The Court's holding rested on the conclusion that "a legislature's decision not to subsidize the exercise of a fundamental right does not

infringe the right." 461 U. S., at 549. Today's opinion, *ante*, at 9, stresses the fact that these nonprofits were permitted to use a separate §501(c)(4) affiliate for their lobbying—but that fact, alluded to in a footnote, *Regan*, 461 U. S., at 545, n. 6, was entirely nonessential to the Court's holding. Indeed, that rationale prompted a separate concurrence precisely because the majority of the Court did not rely upon it. See *id.*, at 551–554 (Blackmun, J., concurring). As for *FCC* v. *League of Women Voters of Cal.*, 468 U. S. 364 (1984), the ban on editorializing at issue there was disallowed precisely because it did not further a relevant, permissible policy of the Federal Communications Act—and indeed was simply incompatible with the Act's "affirmativ[e] encourage[ment]" of the "vigorous expression of controversial opinions" by licensed broadcasters. *Id.*, at 397.

The Court makes a head-fake at the unconstitutional conditions doctrine, *ante*, at 12, but that doctrine is of no help. There is no case of ours in which a condition that is relevant to a statute's valid purpose and that is not in itself unconstitutional (*e.g.,* a religious-affiliation condition that violates the Establishment Clause) has been held to violate the doctrine.* Moreover, as I suggested earlier, the contention that the condition here "coerces" respondents' speech is on its face implausible. Those organizations that wish to take a different tack with respect to prostitution "are as unconstrained now as they were before the enactment of [the Leadership Act]." *National Endowment for Arts* v. *Finley*, 524 U. S. 569, 595 (1998) (SCALIA, J., concurring in judgment). As the Court acknowledges, "[a]s a general matter, if a party objects to a condition on the

——————

*In *Legal Services Corporation* v. *Velazquez*, 531 U. S. 533 (2001), upon which the Court relies, the opinion specified that "in the context of this statute there is no programmatic message of the kind recognized in *Rust* and which sufficed there to allow the Government to specify the advice deemed necessary for its legitimate objectives," *id.*, at 548.

6     AGENCY FOR INT'L DEVELOPMENT *v.* ALLIANCE FOR
OPEN SOCIETY INT'L, INC.

SCALIA, J., dissenting

receipt of federal funding, its recourse is to decline the funds," *ante,* at 7, and to draw on its own coffers.

The majority cannot credibly say that this speech condition is coercive, so it does not. It pussyfoots around the lack of coercion by invalidating the Leadership Act for "*requiring* recipients to profess a specific belief" and "*demanding* that funding recipients adopt—as their own—the Government's view on an issue of public concern." *Ante,* at 12 (emphasis mine). But like King Cnut's commanding of the tides, here the Government's "requiring" and "demanding" have no coercive effect. In the end, and in the circumstances of this case, "compell[ing] *as a condition* of federal funding the affirmation of a belief," *ante,* at 15 (emphasis mine), is no compulsion at all. It is the reasonable price of admission to a limited government-spending program that each organization remains free to accept or reject. Section 7631(f) "defin[es] the recipient" only to the extent he decides that it is in his interest to be so defined. *Ante,* at 12.

\*     \*     \*

Ideological-commitment requirements such as the one here are quite rare; but making the choice between competing applicants on relevant ideological grounds is undoubtedly quite common. See, *e.g., Finley*, *supra.* As far as the Constitution is concerned, it is quite impossible to distinguish between the two. If the government cannot demand a relevant ideological commitment as a condition of application, neither can it distinguish between applicants on a relevant ideological ground. And that is the real evil of today's opinion. One can expect, in the future, frequent challenges to the denial of government funding for relevant ideological reasons.

The Court's opinion contains stirring quotations from cases like *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943), and *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622 (1994). They serve only to distract attention

from the elephant in the room: that the Government is not forcing *anyone* to say *anything*. What Congress has done here—requiring an ideological commitment relevant to the Government task at hand—is approved by the Constitution itself. Americans need not support the Constitution; they may be Communists or anarchists. But "[t]he Senators and Representatives . . . , and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support [the] Constitution." U. S. Const., Art. VI, cl. 3. The Framers saw the wisdom of imposing affirmative ideological commitments prerequisite to assisting in the government's work. And so should we.